[No. B193314. Second Dist., Div. One. Dec. 28, 2007.]

GARY BELZ, Plaintiff and Appellant, v.
CLARENDON AMERICA INSURANCE COMPANY, Defendant and
Respondent.

618

COUNSEL

Krane & Smith and Ralph C. Loeb for Plaintiff and Appellant.

Law Offices of Karen-Denise Lee and Karen-Denise Lee for Defendant and Respondent.

## OPINION

**MALLANO, Acting P. J.**—A homeowner entered into a contract for the construction of an additional building on his property. He later filed suit against the contractor, alleging defects in the construction. The contractor did not notify his liability insurer of the suit. A default was entered. Through an investigator, the insurer learned about the suit after the entry of default and unsuccessfully moved to set the default aside. A default judgment followed.

The homeowner then brought this action against the insurer, seeking payment on the default judgment. The insurer defended on the grounds that the insurance policy did not cover a default judgment entered without timely notice of the suit, and the insured had failed to give notice in time for the insurer to protect its and the insured's interests.

The insurer moved for summary judgment based on the policy provisions. The homeowner argued that the insurer had to suffer prejudice as a result of the lack of notice and that a showing of prejudice had not been made. The insurer countered that prejudice was not required and that, alternatively, the default had prevented it from conducting a thorough investigation of the claim and presenting a defense in the underlying suit. The trial court ruled for the insurer, stating that a showing of prejudice was unnecessary.

■ We conclude that where a default judgment results from a lack of notice by the insured, (1) the insurer is liable on the judgment unless it suffered actual, substantial prejudice, and (2) the mere inability to investigate the claim thoroughly or to present a defense in the underlying suit does not satisfy the prejudice requirement. Accordingly, we reverse.

## I

## BACKGROUND

We accept as true the following facts and reasonable inferences supported by the parties' undisputed evidence on the motion for summary judgment.

(See *Raghavan v. Boeing Co.* (2005) 133 Cal.App.4th 1120, 1125 [35 Cal.Rptr.3d 397].)

In 1999, plaintiff Gary Belz entered into a written agreement with Alan Namay, a general contractor, for the construction of a freestanding "health-plex" at Belz's home. The healthplex included a racquetball court, a rock-climbing wall, a bedroom, and a parking structure. Construction commenced in October 1999 and continued until October 2000.

Defendant Clarendon America Insurance Company (Clarendon) issued a commercial general liability policy to Namay, effective for one year, commencing July 20, 2000.

During or after the construction, Belz saw water leaks in the healthplex, primarily on the racquetball court. Leaks also occurred in other areas. A dispute arose between Belz and Namay over alleged construction defects and the damage to the healthplex.

On December 3, 2001, Belz advised Namay's insurance broker by letter that Belz was making a claim under the Clarendon policy. After learning of the claim, Clarendon contacted its claims handling service, which retained Crawford Claims Management Services (Crawford) to conduct an investigation. Crawford, in turn, assigned the matter to David Warner.

Between January 2002 and September 2002, Warner investigated the claim. He met with Belz and obtained a recorded statement. He toured the health-plex and took photographs. For his part, Belz gave Warner several items, including a report prepared by a leak specialist, a repair estimate from a construction company, and the contact information for the subcontractors who had worked on the project.

Meanwhile, Warner was trying to get in touch with Namay (the insured) by letter, telephone, and visiting Namay's home unannounced. Those efforts were to no avail. Warner never heard from Namay.

By letter dated July 1, 2002, Warner wrote to Belz, stating: ". . . I have been unable to make contact with our insured, as he has not responded to my letters, etc. [Clarendon] regrets any inconvenience this may have caused you as we attempt to investigate this claim. Until we speak with our insured, [Clarendon is] not willing to make a decision on what responsibility [its] insured may have for your water intrusion problems. [¶] . . . [W]e are

continuing our efforts to try and contact our insured so that we may complete the necessary investigation."

On September 19, 2002, Belz called Warner and asked about the status of the claim. Warner said he still had not been able to talk to Namay. Belz replied that he intended to sue Namay. Warner and Belz did not communicate with each other again.

On December 4, 2002, Belz filed a lawsuit against Namay, alleging negligence and breach of contract arising out of the construction of the healthplex (*Belz v. Namay* (Super. Ct. L.A. County, 2003, No. BC286397)). On December 12, 2002, the summons and complaint were personally served on Namay. He did not notify Clarendon of the suit. A responsive pleading was not filed. On January 14, 2003, Belz filed a request for entry of default, which was entered the same day. Namay did not inform Clarendon of the request or default.

In late 2003, a claims adjuster for Clarendon, Michael Barnard, assumed responsibility for Belz's claim. He hired a different company, West Coast Casualty (West Coast), to investigate the claim because Crawford had already taken its "best shot" and come up with nothing.

On February 13, 2004, West Coast's investigator spoke by telephone with Belz and was told about the suit against Namay. The investigator also contacted Belz's attorney and received copies of the documents relating to the suit. West Coast reported its findings in a letter to Barnard.

On February 17, 2004, Clarendon, through Barnard, learned that Belz had sued Namay and that Namay's default had been entered. By letter of the same date, Barnard retained the law firm of Pierce & Weiss to "have the default set aside." Barnard also instructed the firm to "analyz[e] our defense position," develop "defense strategies," file cross-complaints against "all parties" involved in the construction project, and let him know if "early settlement is recommended."

Pierce & Weiss asked Belz to set aside the default voluntarily, but he refused. Thereafter, the firm filed a motion to vacate the default based on Namay's "mistake, inadvertence, surprise, or excusable neglect." (Code Civ. Proc., § 473, subd. (b).) Belz filed opposition. He also filed a request for entry of a default judgment against Namay. Pierce & Weiss filed opposition to the request. On April 28, 2004, the superior court denied the motion to vacate the default and entered a default judgment against Namay in the amount of $191,395.90.

On May 7, 2004, Pierce & Weiss filed a motion for reconsideration and a supporting declaration from Namay, who stated he had not contacted Clarendon or the Pierce firm about the *Belz* suit because he had given the summons and complaint to an attorney handling a bankruptcy case for him. Namay believed that the bankruptcy attorney would handle the matter. An accompanying declaration from the bankruptcy attorney recited that he had not been retained to defend the *Belz* suit, so he did not notify Clarendon or the firm about it; he listed the suit as a potential liability on Namay's bankruptcy petition. (Although Namay was served with process on December 12, 2002, he did not retain the bankruptcy attorney until April 1, 2003, long after a response to the complaint was due.) Belz filed opposition to the motion for reconsideration. On July 1, 2004, the superior court denied the motion.

Namay filed an appeal from the default judgment. It was dismissed as untimely by order of this court dated May 31, 2005 (*Belz v. Namay*, B177303).

On May 6, 2004, shortly after communicating with Namay for the first time, Clarendon sent him a letter denying coverage. Clarendon informed Namay that there was no potential coverage under the policy because (1) Namay had failed to notify Clarendon of the suit, resulting in a default judgment against him; (2) the property damage occurred while Namay was still working on the project; (3) Namay did not cooperate with Clarendon in investigating Belz's claim; and (4) the property damage was caused by subcontractors who did not obtain insurance naming Namay as an additional insured.

On June 30, 2005, Belz filed this action against Clarendon, seeking to recover the amount of the default judgment. Belz premised his claim on the Insurance Code, which requires that liability policies contain a "provision that whenever judgment is secured against the insured . . . in an action based upon bodily injury, death, or property damage, then an action may be brought against the insurer on the policy and subject to its terms and limitations, by such judgment creditor to recover on the judgment." (Ins. Code, § 11580, subd. (b)(2); see *Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone* (2003) 107 Cal.App.4th 54, 67–68, 78–81 [131 Cal.Rptr.2d 777] [discussing rights of judgment creditor under judgment obtained against insured].)

On July 8, 2005, Clarendon filed a general denial, alleging defenses based on provisions of the policy. (See Code Civ. Proc., § 431.30, subd. (d).)

On February 22, 2006, Clarendon filed a motion for summary judgment, arguing that there was no potential coverage based on the following language in section IV, paragraph 6.d. of the policy: "The Company shall not be liable for any cost, payment, expense (including legal expense) or obligation assumed or incurred by an insured without the Company's express consent. The Company further shall have *no liability* for any *default judgment entered against any insured*, nor for any judgment, or settlement or determination of liability rendered or entered *before notice to the Company* giving the Company a reasonable time in which to protect its and its insured's interests. . . ." (Italics added.)

In his opposition papers, Belz contended that the motion should be denied because Clarendon had not shown that Namay's conduct had caused any prejudice. Belz also filed objections to some of Clarendon's supporting declarations.

In reply, Clarendon asserted that a showing of prejudice was not necessary and, alternatively, Namay's conduct had resulted in prejudice by precluding it from thoroughly investigating Belz's claim and from presenting a defense in the underlying suit.

On May 25, 2006, the trial court heard argument and granted the motion, concluding that Namay had breached section IV, paragraph 6.d. of the policy and that Clarendon did not have to establish prejudice. An order to that effect and a judgment were entered on June 20, 2006.

Belz responded with a motion requesting that the trial court rule upon his evidentiary objections and specify the evidence upon which the court relied in granting summary judgment. Clarendon filed opposition. By amended order filed on August 3, 2006, the trial court sustained Belz's objections in their entirety and cited the evidence supporting the granting of summary judgment. Belz filed an appeal.

## II

## DISCUSSION

A motion for summary judgment must be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

" ' "A defendant seeking summary judgment has met the burden of show-ing that a cause of action has no merit if that party has shown that one or more elements of the cause of action cannot be established [or that there is a complete defense to that cause of action]. . . . In reviewing the propriety of a summary judgment, the appellate court independently reviews the record that was before the trial court. . . . We must determine whether the facts as shown by the parties give rise to a triable issue of material fact. . . ." . . . We accept as undisputed facts only those portions of the moving party's evidence that are not contradicted by the opposing party's evidence.' " (*Raghavan v. Boeing Co., supra,* 133 Cal.App.4th at p. 1132.)

■ The rules of construction applicable to contracts govern the interpre-tation of insurance policies. We interpret the words of the policy in their ordinary sense, according to the plain meaning a layperson would give them. (See *Davis v. Farmers Ins. Group* (2005) 134 Cal.App.4th 100, 104 [35 Cal.Rptr.3d 738]; *Blasiar, Inc. v. Fireman's Fund Ins. Co.* (1999) 76 Cal.App.4th 748, 753–754 [90 Cal.Rptr.2d 374].) "The language of the policy must be read in the context of the instrument as a whole . . . ." (*Davis,* at p. 104.)

Here, the focus is on the policy language stating that Clarendon "shall have *no liability for any default judgment entered against any insured,* nor for any judgment . . . or determination of liability rendered or entered *before notice to the Company* giving the Company a reasonable time in which to protect its and its insured's interests." (Italics added.) The question on appeal rests on whether this portion of the Clarendon policy is a notice provision, a coopera-tion clause, or a no-voluntary-payment provision. We conclude, unlike the trial court, that the pertinent language is a notice provision and that Clarendon must show prejudice from the lack of notice.

■ A notice provision requires the insured to inform the insurer promptly of any claims, suits, or occurrences, and obligates the insured to forward im-mediately to the insurer a copy of any demands, notices, summonses, or legal papers received in connection with a claim or suit. (See *Truck Ins. Exchange v. Unigard Ins. Co.* (2000) 79 Cal.App.4th 966, 974–975 [94 Cal.Rptr.2d 516].) A standard cooperation clause provides that the insured will cooperate with the insurer in the investigation, settlement, or defense of a claim or suit. (*Id.* at p. 975.) A no-voluntary-payment provision states that the insured will not, except at his or her own expense, voluntarily make a payment, assume any obligation, or incur any expense, without the insurer's consent. (*Ibid.*) Under California law, an insured's breach of a notice provision or a cooperation clause does not excuse the insurer's performance unless the insurer can show that it suffered prejudice; a breach of a no-voluntary-payment provision does

not require a showing of prejudice. As we have previously discussed at length in *Truck Ins. Exchange*:

■ "These three provisions play an important role in defining the insured-insurer relationship. With respect to notice provisions, one Court of Appeal has explained: ' "[A]n 'occurrence' policy provides coverage for any acts or omissions that arise during the policy period even though the claim is made after the policy has expired." . . . [¶] . . . [¶] Occurrence policies were developed to provide coverage for damage caused by collision, fire, war, and other identifiable events. . . . Because the occurrence of these events was relatively easy to ascertain, the insurer was able to "conduct a prompt investigation of the incident . . . ." . . . Notice provisions contained in such occurrence policies were "included to aid the insurer in investigating, settling, and defending claims[.]" . . .' . . . If an insured breaches a notice provision, resulting in substantial prejudice to the defense, the insurer is relieved of liability. . . .

■ "Similarly, cooperation clauses serve an important purpose. '[A] condition of a policy requiring the cooperation and assistance of the assured in opposing a claim or an action lodged against him by an injured person is material to the risk and of the utmost importance in a practical sense. Without such cooperation and assistance the insurer is severely handicapped and may in some instances be absolutely precluded from advancing any defense.' . . . '[S]uch provisions "enable the [insurer] to possess itself of all knowledge, and all information as to other sources and means of knowledge, in regard to facts, material to [its] rights, to enable [it] to decide upon [its] obligations, and to protect [itself] against false claims." ' . . . Where an insured violates a cooperation clause, the insurer's performance is excused if its ability to provide a defense has been substantially prejudiced. . . .

■ "Finally, we come to the provision prohibiting an insured from making voluntary payments without the insurer's consent. Typically, a breach of that provision occurs, if at all, before the insured has tendered the defense to the insurer. 'The duty to defend is "a continuing one, arising on *tender of defense* and lasting until the underlying lawsuit is concluded . . . , or until it has been shown that there is no potential for coverage . . . ." ' . . . Phrased somewhat differently, ' "[t]he duty to defend arises when the insured *tenders defense* of the third party lawsuit to the insurer." ' . . . The 'temporal limits of the insurer's duty to defend [fall] between tender of the defense and conclusion of the action.' . . .

■ "The same temporal limits are relevant where an insured has made a voluntary payment in defending an action or resolving a claim. As our Supreme Court has noted: 'The provisions . . . requiring [the insurer's] prior

consent to the expenditure of defense costs and permitting [the insurer] to assume the defense of any claim are common in [all] liability insurance policies. Their purpose "is to prevent collusion as well as to invest the insurer with the complete control and direction of the defense or compromise of suits or claims. . . ." ' (*Gribaldo, Jacobs, Jones & Associates v. Agrippina Versicherunges A.G.* (1970) 3 Cal.3d 434, 449 [91 Cal.Rptr. 6, 476 P.2d 406] . . . .) [¶] . . . [¶]

■ "More recently, in *Jamestown Builders, Inc. v. General Star Indemnity Co.* (1999) 77 Cal.App.4th 341 [91 Cal.Rptr.2d 514] . . . , a home developer spent more than $1.4 million to repair water intrusion defects in a residential development, all without notifying its insurer [of the homeowners' damage claims]. . . . [The insurer declined to reimburse the developer for the repair expenses.] In a subsequent bad faith action by the developer, the insurer invoked the provision prohibiting voluntary payments. The trial court dismissed the action on demurrer. The Court of Appeal affirmed, stating: 'California law enforces such no-voluntary-payments provisions in the absence of economic necessity, insurer breach, or other extraordinary circumstances. . . . They are designed to ensure that responsible insurers who promptly accept a defense tendered by their insureds thereby gain control over the defense and settlement of the claim.' . . .

■ "The Court of Appeal went on to explain that, unlike a notice provision or a cooperation clause, a no-voluntary-payment provision can be enforced without a showing of prejudice: ' "[T]he existence or absence of prejudice to [the insurer] is simply irrelevant to [its] duty to indemnify costs incurred *before* notice. The policy plainly provides that notice is a *condition precedent* to the insured's right to be indemnified; a fortiori the right to be indemnified cannot relate back to payments made or obligations incurred before notice." ' " (*Truck Ins. Exchange v. Unigard Ins. Co., supra*, 79 Cal.App.4th at pp. 975–977, citations omitted; accord, *Insua v. Scottsdale Ins. Co.* (2002) 104 Cal.App.4th 737, 746 [129 Cal.Rptr.2d 138] [insurer must show prejudice where insured breaches notice provision or cooperation clause but not where insured makes voluntary payment]; *Faust v. The Travelers* (9th Cir. 1995) 55 F.3d 471, 472–473 [California courts consistently enforce no-voluntary-payment provision in absence of prejudice, but prejudice is necessary to enforce notice provision or cooperation clause]; see Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2007) ¶¶ 7:407 to 7:417, pp. 7A-133 to 7A-135 [notice provision]; *id.,* ¶¶ 7:419 to 7:425.15, pp. 7A-135 to 7A-137 [cooperation clause]; *id.,* ¶¶ 7:439.5 to 7:439.10, pp. 7A-140 to 7A-142 [no-voluntary-payment provision].)

Most cases applying a no-voluntary-payment provision have involved *pre-tender* payments by the insured. (See *Truck Ins. Exchange v. Unigard Ins. Co., supra,* 79 Cal.App.4th at pp. 976–977.) In one case, however, the court dispensed with a showing of prejudice for *posttender* payments, reasoning that the prohibition on voluntary payments is based on an insurer's *lack of consent,* which can also occur *after* acceptance of tender and while the insurer is providing a defense. (See *Low v. Golden Eagle Ins. Co.* (2003) 110 Cal.App.4th 1532, 1544–1547 [2 Cal.Rptr.3d 761].)

■ A no-voluntary-payment provision encourages an insurer to act promptly in accepting a tender of defense and thereby gain control over the resolution of the claim. "That means insureds cannot unilaterally settle a claim before the establishment of the claim against them . . . . In short, the provision protects against coverage by fait accompli." (*Jamestown Builders, Inc. v. General Star Indemnity Co., supra,* 77 Cal.App.4th at p. 346 (*Jamestown Builders*).)

■ "There may be exceptions to the prohibition on voluntary payments, as where the insured is unaware of the identity of the insurer, the payment is necessary for reasons beyond the insured's control, or the insured faces a situation requiring an immediate response to protect its legal interests." (*Truck Ins. Exchange v. Unigard Ins. Co., supra,* 79 Cal.App.4th at p. 977, fn. 15.) In a circumstance of that nature, the insured's payment is considered *involuntary.* (See *Tradewinds Escrow, Inc. v. Truck Ins. Exchange* (2002) 97 Cal.App.4th 704, 710–711 [118 Cal.Rptr.2d 561].)

■ Clarendon equates an insurer's payment of a judgment with an insured's unilateral expenditures to defend and settle a suit. We reject that comparison. The underlying suit by Belz involved a *default* judgment *against* Namay, not a *voluntary* payment *by* him. The courts have applied a no-voluntary-payment provision to *affirmative* acts by the insured, namely, the making of unapproved expenditures in response to a claim or suit, including the payment of a settlement, attorney fees, litigation costs, repair expenses, and remediation costs. (See, e.g., *Low v. Golden Eagle Ins. Co., supra,* 110 Cal.App.4th at pp. 1537–1538; *Insua v. Scottsdale Ins. Co., supra,* 104 Cal.App.4th at pp. 739–740; *Jamestown Builders, supra,* 77 Cal.App.4th at pp. 344–347.) Here, Namay did not pay or settle anything in the underlying suit. On the contrary, he did virtually nothing at all.

In the context of insurance defense, a default judgment may be—as in the underlying suit—the result of several failures by the insured: a *lack of timely notice* to the insurer, a *failure to cooperate* with the insurer, and—especially important here—a *lack of voluntary payments* such as defense costs or a

settlement. Indeed, if this case truly presented a no-voluntary-payment situation, the posture of the litigation would probably be quite different. Most likely, *Namay* would now be suing Clarendon, seeking reimbursement for defending and settling the underlying suit at his own expense, and Belz would be out of the picture. (See, e.g., *Low v. Golden Eagle Ins. Co., supra,* 110 Cal.App.4th 1532 [insured sued insurer to recover payments made by insured to third party plaintiff]; *Insua v. Scottsdale Ins. Co., supra,* 104 Cal.App.4th 737 [same]; *Jamestown Builders, supra,* 77 Cal.App.4th 341 [same]; *Gribaldo, Jacobs, Jones & Associates v. Agrippina Versicherunges A.G., supra,* 3 Cal.3d 434 [same]; see also *Truck Ins. Exchange v. Unigard Ins. Co., supra,* 79 Cal.App.4th 966 [contribution sought by insurer from coinsurer for defense costs incurred in underlying suit not permitted where coinsurer was not tendered defense or given notice of possible contribution before underlying suit settled].)

It follows that Namay's default was the result of a lack of notice or failure to cooperate and was not attributable to the payment of a settlement or defense costs. The courts have repeatedly recognized that, in circumstances like those here, the insurer must show actual, substantial prejudice to prevail on a policy defense. In *Campbell v. Allstate Ins. Co.* (1963) 60 Cal.2d 303 [32 Cal.Rptr. 827, 384 P.2d 155] (*Campbell*), the insured, Marvin Hammer, rear-ended the plaintiffs' vehicle while it was stopped at a red light. Hammer promptly notified his insurer, Allstate, of the accident. The plaintiffs sued Hammer, served him with process, and sent a copy of the summons and complaint to Allstate. Hammer left California to live elsewhere. Allstate could not find him and, as a consequence, could not conduct a thorough investigation. Eventually, a default judgment was entered in the case.

The plaintiffs sued Allstate on the default judgment. The trial court found in favor of Allstate on the ground that Hammer's failure to cooperate raised a presumption of prejudice. The Supreme Court reversed, explaining: "An insurer may assert defenses based upon a breach by the insured of a condition of the policy such as a cooperation clause, but the breach cannot be a valid defense unless the insurer was substantially prejudiced thereby. . . . Similarly, it has been held that prejudice must be shown with respect to breach of a notice clause." (*Campbell, supra,* 60 Cal.2d at pp. 305–306, citations omitted.) "The burden of proving that a breach of a cooperation clause resulted in prejudice is on the insurer." (*Id.* at p. 306.) "Although it may be difficult for an insurer to prove prejudice in some situations, it ordinarily would be at least as difficult for the injured person to prove a lack of prejudice, which involves proof of a negative. . . . [W]e are of the view

that a judicially created presumption of prejudice, whether conclusive or rebuttable, is unwarranted . . . ." (*Id.* at p. 307, citation omitted.)

In examining the record in *Campbell* for prejudice, the court noted that, according to the police report, Hammer was cited for driving too closely, admitted he had been drinking, and refused to give a written statement. The court concluded that, as a matter of law, Allstate "would have been liable on its policy even if Hammer had cooperated with it." (*Campbell, supra*, 60 Cal.2d at p. 306.)

In *Billington v. Interinsurance Exchange* (1969) 71 Cal.2d 728 [79 Cal.Rptr. 326, 456 P.2d 982] (*Billington*), the plaintiff was injured while riding as a passenger in the insured's car and filed suit against the insured, accusing him of willful misconduct and intoxication. The insurer filed an answer on his behalf, raising the defenses of contributory negligence and assumption of the risk. After the insured failed to appear for his deposition several times, the trial court struck his answer and entered a default judgment against him. The plaintiff then brought suit against the insurer on the judgment. The trial court found for the insurer, concluding that the insured's failure to cooperate had substantially prejudiced the insurer by preventing it from offering evidence in support of its defenses.

The Supreme Court reversed, stating: "The primary question presented is whether a determination that an insurer was substantially prejudiced by its insured's breach of a cooperation clause may be based upon the conclusion that there might have been advanced a valid defense which the finder of fact could reasonably have accepted. In our view, a holding of substantial prejudice cannot be supported upon this tenuous foundation." (*Billington, supra*, 71 Cal.2d at p. 733.) The court continued:

"If an insurer could meet its burden of establishing substantial prejudice from the breach of a cooperation clause by a mere showing that a jury could reasonably and properly have accepted a defense, the holding of *Campbell* would be effectively vitiated since we can conceive of few cases in which an insurer would be unable to maintain that a finding could reasonably have been made in a [third party] defendant's favor. . . .

 "We hold, therefore, that an insurer, in order to establish it was prejudiced by the failure of the insured to cooperate in his defense, must establish at the very least that if the cooperation clause had not been breached there was a substantial likelihood the trier of fact would have found in the insured's favor." (*Billington, supra*, 71 Cal.2d at p. 737.) Nevertheless, the

court could not decide the prejudice issue as a matter of law because the evidence was in conflict as to whether the insured was intoxicated and whether the plaintiff had shown a disregard for her own safety by riding with him. Accordingly, the court remanded the case for a determination as to prejudice. (*Id.* at p. 738.)

In *Northwestern Title Security Co. v. Flack* (1970) 6 Cal.App.3d 134 [85 Cal.Rptr. 693], the insurer declined to provide a defense to its insured, contending that the insured had given late notice of the claim. The insured retained an attorney at its own expense and settled a $30,000 claim for $5,500. (*Id.* at pp. 140, 146–147.) The insured then brought suit against the insurer, seeking reimbursement for the settlement, attorney fees, and litigation costs. The insurer's defense was based on the delay in notice. The trial court found for the insured.

The Court of Appeal affirmed, pointing out that a late-notice defense "is not carried by a showing of [a] *possibility* of prejudice to the insurer. Rather, *actual* prejudice must be shown." (*Northwestern Title Security Co. v. Flack, supra*, 6 Cal.App.3d at p. 141, italics added.) "[P]rejudice does not arise merely because a delayed or late notice has denied the insurance company the ability to contemporaneously investigate the claim or interview witnesses. . . . [T]he burden was upon [the insurer] to show that, but for the delay in making a prompt investigation and in hiring [its] own attorney at the early stages, there was a substantial likelihood that [it] could have prevailed in . . . [the] action brought against [the insured] or that [it] could have settled the case for a small sum or a smaller sum than that for which [the] insured ultimately settled the claim." (*Id.* at pp. 142–143.)

In *Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865 [151 Cal.Rptr. 285, 587 P.2d 1098] (*Clemmer*), the insured did not notify the insurer of the wrongful death action brought against him or cooperate in defending the action. Instead, the insurer learned about the action from plaintiffs' counsel a day before the trial court entertained a request to enter default. The plaintiffs eventually obtained a default judgment in excess of $2 million and sued the insurer on the judgment. The insurer argued that it had been prejudiced by a lack of notice, tender, and cooperation. The trial court rejected that argument. So did the Supreme Court. Citing *Campbell, supra*, 60 Cal.2d 303 the high court stated in *Clemmer*: "[The insurer's] sole suggestion before the trial court—and before this court—concerning the manner in which it had suffered prejudice by the failure of notice and tender was couched in ipso facto terms: 'Surely there is prejudice if all of a sudden somebody is going to come after you for two million-plus dollars, in a situation where you have never been notified by anybody about

the matter until after a default was taken.' What this argument fails to recognize, of course, is that prejudice is not shown simply by displaying end results; the probability that such results could or would have been avoided absent the claimed default or error must also be explored." (*Clemmer*, at p. 883 & fn. 12.)

 Thus, "[i]n order to demonstrate actual, substantial prejudice from lack of timely notice, an insurer must show it lost something that would have changed the handling of the underlying claim. . . . To establish actual prejudice, the insurer must show a substantial likelihood that, with timely notice, and notwithstanding [any] denial of coverage or reservation of rights, it would have settled the claim for less or taken steps that would have reduced or eliminated the insured's liability." (*Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 763 [15 Cal.Rptr.2d 815]; see *1231 Euclid Homeowners Assn. v. State Farm Fire & Casualty Co.* (2006) 135 Cal.App.4th 1008, 1020–1021 [37 Cal.Rptr.3d 795] [insurer would be prejudiced if insured were allowed to file bad faith suit in 2001 based on 1994 earthquake damage where insured had withdrawn its prior earthquake claim one month after earthquake—justifying insurer's decision to halt investigation—and insured had since repaired damaged areas—altering evidence relevant to bad faith suit].)

We give no weight to Clarendon's reliance on dicta in two older cases—*Valladao v. Fireman's Fund Indem. Co.* (1939) 13 Cal.2d 322 [89 P.2d 643] and *Purefoy v. Pacific Automobile Indem. Exch.* (1935) 5 Cal.2d 81 [53 P.2d 155]—that "prejudice may be presumed from a failure to cooperate which interferes with and precludes a proper and prompt investigation of the accident." (*Valladao*, at p. 334; accord, *Purefoy*, at p. 88.) As the Supreme Court later clarified, "[i]n each of those cases the court found that prejudice had been established by the facts proved and that it was therefore unnecessary to determine whether a showing of prejudice should be required." (*Campbell, supra*, 60 Cal.2d at p. 306.) In a similar vein, Clarendon merely asserts that Namay's default interfered with its ability to conduct a thorough investigation and to present a defense in the underlying suit. But that assertion assumes "too lenient [a] test" for prejudice. (*Shell Oil Co. v. Winterthur Swiss Ins. Co., supra*, 12 Cal.App.4th at pp. 763–764.)

Further, Clarendon argues that the language at issue is a no-voluntary-payment provision because of its location in the policy. Turning to the policy, the first three paragraphs of section IV (pars. 6.a.–c.) contain several provisions relating to notice and cooperation, including the insured's obligation to notify the insurer promptly of a suit and to cooperate in the investigation, settlement, and defense of a suit.

The language at the heart of the appeal—disclaiming liability for a default judgment entered without timely notice to the insurer—is contained in the fourth and final paragraph of section IV (par. 6.d.). (See, *ante*, at p. 624 [quoting paragraph].) More specifically, the pertinent language appears in the *second* sentence of that paragraph. Clarendon places equal importance on the *first*, or preceding, sentence: "The Company shall not be liable for any cost, payment, expense (including legal expense) or obligation assumed or incurred by an insured without the Company's express consent." As Clarendon sees it, the proximity of these sentences means they should be interpreted to cover the same subject: voluntary payments by the insured, which do not require a showing of prejudice.

We agree with Clarendon that the first sentence is a traditional no-voluntary-payment provision. But the placement of the two sentences in the same paragraph, albeit next to one another, does not mean we should ignore the plain meaning rule in construing the applicable language of the second sentence. As explained above, that language is a notice provision, not a prohibition on voluntary payments.

■ Last, Belz raises a procedural issue, arguing that Clarendon is "bound by the default judgment" against Namay because it did not *intervene* in the underlying suit but instead filed a motion to set aside the default. We disagree. Given that a judgment against an insured may be satisfied through a direct action against a liability insurer (see Ins. Code, § 11580, subd. (b)(2)), the insurer may choose to intervene where, for example, the insured is an individual in jail or a corporation that has had its corporate status revoked. (See *Reliance Ins. Co. v. Superior Court* (2000) 84 Cal.App.4th 383, 385–387 [100 Cal.Rptr.2d 807].) Yet "[t]he insurer may *either* intervene . . . prior to judgment *or* move under Code of Civil Procedure section 473 to set aside the default judgment." (*Reliance Ins. Co.*, at p. 387, italics added; accord, *Clemmer, supra*, 22 Cal.3d at pp. 884–886.) Here, Clarendon did not learn about the underlying suit until after the entry of default against Namay and, as permitted by law, chose to challenge the default by motion rather than seek intervention.

■ In sum, because Namay breached a notice provision, and Clarendon did not make a showing that it suffered actual, substantial prejudice, the trial court erred in granting summary judgment. We express no view as to exactly what Clarendon must show to satisfy the prejudice requirement. Nor have we limited the defenses that Clarendon may assert against Belz. (See *Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone, supra*, 107 Cal.App.4th at p. 68.)

## III

## DISPOSITION

The judgment is reversed. Appellant is entitled to costs on appeal.

Rothschild, J., and Jackson, J.,* concurred.

Respondent's petition for review by the Supreme Court was denied March 12, 2008, S160483. Moreno, J., did not participate therein.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.